The PEOPLE of the State Of Colorado, Complainant,

v.

Robert J. WEISBARD, Respondent.

No. 99PDJ072.

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

Aug. 22, 2000.

Opinion by Presiding Disciplinary Judge ROGER L. KEITHLEY and Hearing Board members, B. LaRAE ORULLIAN, a representative of the public, and HELEN R. STONE, a member of the bar.

## OPINION AND ORDER IMPOSING SANCTIONS

*SANCTION IMPOSED: EIGHTEEN MONTH SUSPENSION*

A sanctions hearing was held on January 18, 2000, before the Presiding Disciplinary Judge ("PDJ") and two hearing board members, B. LaRae Orullian and Helen R. Stone. James S. Sudler, Assistant Attorney Regulation Counsel represented the People of the State of Colorado (the "People"). The respondent Robert J. Weisbard ("Weisbard") appeared *pro se*, extensively cross-examined the People's witnesses and testified on his own behalf.

### I. MOTION TO SET ASIDE DEFAULT

■  Upon the People's motion, on September 22, 1999, the PDJ granted default on all of the charges set forth above with the exception of the following: the alleged violation of Colo. RPC 1.3 in claims two and seven, the alleged violation of Colo. RPC 1.4(a) in claim two, and the alleged violation of Colo. RPC 8.4(c) in claim eight.

On March 3, 2000, more than a month *after* the sanctions hearing, Weisbard retained counsel, moved to set aside the default on the basis of excusable neglect and sought leave to file an Answer. Presentation of testimony and oral argument on the motion was held on May 22, 2000. Weisbard argued that his temporary inability to cope with the disciplinary process constituted excusable neglect. He alleged that in August or September 1998, he began suffering personal and emotional problems, including significant marital problems. Weisbard's marital therapist identified symptoms of depression which, in Weisbard's view, contributed to his progression into disregard of his responsibilities in the disciplinary process. Weisbard found that he was unable to cope with his disciplinary difficulties, and hoped that the problems would disappear. The People argued that Weisbard has failed to establish the level of excusable neglect required to set aside the default, and that doing so would be inequitable since a full hearing has already transpired and that the witnesses who dedicated their time to testify would be prejudiced.

C.R.C.P. 251.15(b) provides:

[A] respondent who fails to file a timely answer may, upon a showing that the failure to answer was the result of mistake, inadvertence, surprise, or excusable neglect, obtain leave of the Presiding Disciplinary Judge to file an answer.

■ The motion [to set aside default judgment] is ... addressed to the sound discretion of the trial court, and its decision will not be disturbed absent a clear abuse of that discretion. *See* C.R.C.P. 55(c); *Sumler v. District Court*, 889 P.2d 50, 56 (Colo.1995). The trial court may set aside an entry of default for "good cause shown," and if judgment has entered on the default, the court may set it aside in accordance with C.R.C.P. 60(b). *Dunton v. Whitewater West Recreation, Ltd.*, 942 P.2d 1348, 1351 (Colo.App. 1997). In the context of disciplinary proceedings, C.R.C.P. 251.15(b) should be read together with C.R.C.P. 55(c). *See* C.R.C.P. 251.18(d). A motion to set aside a default under C.R.C.P 55(c) and a motion to vacate a judgment under C.R.C.P. 60(b) on the basis of excusable neglect are sufficiently analo-

gous to justify application of the same standards to either motion. *Dunton*, 942 P.2d at 1351. In considering either type of motion, the trial court should base its decision on the following three criteria: (1) whether the neglect that resulted in the entry of judgment by default was excusable; (2) whether the moving party has alleged a meritorious defense, and (3) whether relief from the challenged order would be consistent with considerations of equity. *Buckmiller v. Safeway Stores, Inc.*, 727 P.2d 1112, 1116 (Colo.1986). The failure of the movant to satisfy any one of them justifies the denial of the motion. *Id.* The party seeking relief has the burden of establishing grounds for relief by clear, strong, and satisfactory proof. *Dunton*, 942 P.2d at 1351.

■ In general, excusable neglect involves unforeseen circumstances which would cause a reasonably prudent person to overlook a required act in the performance of some responsibility. *Colorado Dept. of Public Health and Environment v. Caulk*, 969 P.2d 804, 809 (Colo.App.1998). Failure to act because of carelessness and negligence is not excusable neglect. *Id., citing Messler v. Phillips*, 867 P.2d 128, 136 (Colo.App.1993).

Weisbard's allegation that beginning in August or September 1998 he began to have personal problems and suffer from depression is not sufficient to constitute "excusable neglect" under the precedent set forth above. The court file indicates that Weisbard acknowledged receipt of service of the Complaint and Citation in this matter on May 28, 1999, and that the Motion for Default was filed and mailed to Weisbard on July 13, 1999. Weisbard does not dispute that he had notice of the Motion for Default. The Order entering default issued on September 22, 1999. Weisbard thus had several months in which to respond to complainant's Motion. Similarly, Weisbard had several months between the time the Motion for Default was granted and the sanctions hearing on January 18, 2000 to file a motion to reconsider. Further, when he appeared *pro se* at the hearing, he did not request that the PDJ set aside the default. Therefore, Weisbard had ample opportunity before and after the entry of default to address the issue, and made no

attempt to do so at the hearing. Rather, he waited more than a month following the sanctions hearing.

Further, Weisbard's personal and emotional problems did not rise to such a level as to prevent Weisbard from practicing law during the relevant time period. He was able to function concerning other matters and was therefore not so incapacitated as to make him unable, if he had so chosen, to overcome his difficulties responding to the disciplinary matters. There is surely no respondent attorney who finds the disciplinary process enjoyable; it is undoubtedly emotionally challenging to each attorney involved. Were the PDJ to grant the within motion based on the evidence and pleadings presented, any attorney who could not bring himself or herself to face the proceedings would not be required to fulfill the affirmative obligation to do so.

■ Weisbard's argument to set aside the default entered is inadequate to establish excusable neglect. *In the Matter of Alfred J. Turk, III,* 267 Ga. 30, 471 S.E.2d 842, 844 (1996)(holding that the respondent attorney's failure to file an answer to a disciplinary complaint was a result of personal problems, numerous office moves, improper calendaring, misunderstanding of the bar rules, and preoccupation with a prior disciplinary proceeding did not constitute "excusable neglect" which would warrant the setting aside of a default judgment against him). The *Turk* court noted that the respondent attorney's moving to set aside the default in the disciplinary proceeding evidenced conduct "similar to and consistent with his previous violations involving his clients." *Id.* at 844. The same is true here. Weisbard delayed in addressing his responsibilities towards the disciplinary process the same way he delayed in responding to clients' demands for the return of their funds and their files. An attorney has an affirmative duty to cooperate in the disciplinary process and if they fail to comply with this imperative, they must justify their failure. *In the Disciplinary Matter Involving Robert M. Beconovich,* 884 P.2d 1080, 1083 (Alaska 1994)(refusing to set aside order deeming complaint admitted where attorney failed to file an answer). Having found that Weisbard has failed to establish

excusable neglect, the PDJ need not complete the analysis set forth in *Buckmiller, supra,* as to whether Weisbard has raised a meritorious defense and whether relief from the entry of default would be consistent with considerations of equity. Accordingly, Weisbard's Motion to Set Aside Entry of Default and his request for leave to file an Answer is denied.

At the sanctions hearing, the People's Exhibits 1 through 3 and Respondent's Exhibit A were offered and admitted into evidence. The PDJ and Hearing Board heard testimony from Fara S. Mawhinney and Beverly Kay Hammons. The PDJ and Hearing Board considered argument of the parties, the facts established by the entry of default, the exhibits admitted, and made the following findings of fact which were established by clear and convincing evidence:

## II. FINDINGS OF FACT

Robert J. Weisbard has taken and subscribed the oath of admission, was admitted to the bar of the Colorado Supreme Court on October 27, 1988, and is registered upon the official records, attorney registration number 18038. Weisbard is subject to the jurisdiction of this court pursuant to C.R.C.P. 251.1(b).

### Background

Weisbard and Fara Schneider Mawhinney ("Mawhinney") formed a limited liability company (the "LLC") in 1995. The original intent of the parties in creating the LLC was to share advertising and office expenses, but not clients or client-generated income. In January 1997, Mawhinney and Weisbard entered into a verbal agreement that the proceeds from all matters accepted on an hourly basis by the LLC subsequent to that date would be shared between the two attorneys. In June 1998, a dispute arose over the proceeds of a settlement resulting from a matter involving two clients which Mawhinney handled on a contingent fee basis. After paying the LLC's paralegal a bonus of $3,500, Mawhinney deposited the remainder of the $20,000 contingent fee into a separate account rather than the LLC's account. Mawhinney believed the settlement proceeds

should not be shared with Weisbard because the matter did not fall within the scope of the verbal agreement: she accepted the case prior to the agreement, and she handled the matter on a contingency fee basis. Weisbard discovered that the contingent fee had not been placed in the LLC account, and, while Mawhinney was on vacation, changed the locks on the office. He took control of the LLC's operating and trust accounts amounting to approximately $20,000, removed the funds and placed them in a new trust account with only his name on the account. Weisbard did not disclose to Mawhinney the whereabouts of the new trust account.

Numerous clients were impacted as a result of the LLC's breakup.

### Claim One: the Travis Matter

Mary Travis ("Travis") retained Weisbard in April 1997 to handle an estate matter. She paid him a retainer in the amount of $2,000. Subsequently, Weisbard failed to respond to telephone calls from Travis regarding the status of her case. In July 1998, Travis advised Weisbard that she wanted Mawhinney to represent her. As of June 1998, Travis had a credit balance of $723.07 with the LLC, and in July, Travis wrote to Weisbard demanding a refund of the balance in her account as well as the return of her documents. Weisbard advised Travis that the LLC was dissolving and that an accounting was being prepared. He stated that a refund would not be forthcoming until he obtained an accounting. Despite repeated requests, Travis did not receive her refund until February 1999, and never received an accounting. Weisbard failed to return the documents Travis requested until some five months after they were requested.

### Claim Two: the Hammons Matter

In February 1998, Beverly Kay Hammons ("Hammons") hired Weisbard to modify a separation agreement. She paid him a retainer in the amount of $1,750. On March 30, 1998, the court ordered Weisbard to respond to the petition to revise the separation

agreement on or before April 15, 1998. Weisbard mailed the response to the court on April 15, 1998. On April 20, 1998, the court issued an order stating that no response had been received from Hammons and granted the petition. Weisbard filed a motion for reconsideration which was denied by the court. For a two-month period thereafter, Hammons repeatedly asked Weisbard to refund her payment and return all of her documents. Weisbard failed to do so. Hammons hired a new attorney. After Hammons filed a complaint with the Office of Attorney Regulation Counsel, Weisbard sent her a final statement of charges, indicating she was owed a refund in the amount of $186.50. Hammons brought suit in small claims court for, among other claims, the fees she had paid Weisbard. In attempting to resolve the small claims suit, Weisbard offered to refund the $186.50 to Hammons in return for a complete release. Hammons refused. The small claims suit case was eventually dismissed because of Hammons' failure to comply with a procedural requirement.

As of the date of the sanctions hearing, Weisbard had failed to refund that amount to Hammons.[1] Hammons suffered serious injury as the result of Weisbard's conduct.

### Claim Three: the Remus Matter

In April 1998, Lea Remus ("Remus") retained Weisbard to represent her in her dissolution of marriage. She paid him a retainer in the amount of $2,200. Remus received notice in June 1998 that the firm was dissolving and that she could choose either Weisbard or Mawhinney to represent her, and she chose Mawhinney. Mawhinney informed Remus that $1,596.54 of her retainer remained in the LLC trust account. In July 1998, Remus requested that Weisbard refund that amount. Two weeks later, Weisbard advised Remus that he could not issue a refund until an accounting of the LLC funds had been completed. Remus did not receive a refund until some seven months later. As of mid-April 1999, Remus had not received an accounting.

---

1. At oral argument on the motion to set aside default, it was represented to the PDJ that Weisbard had recently refunded the $186.50. The

People neither alleged nor argued that Weisbard's retention of the $186.50 constituted conversion.

### Claim Four: the Shefrin Matter

In June of 1998, Weisbard filed a civil complaint against Mawhinney, seeking, among other things, his share of the disputed contingent fee settlement proceeds. In the course of those proceedings, Weisbard informed Mawhinney's attorney, Bradley N. Shefrin, that unless the money in dispute was returned to him, he would seek to file criminal charges and a disciplinary complaint against Mawhinney. Weisbard sent correspondence to Mawhinney's attorney in which he stated:

> [I]n the event that the entire fees in the amount of $20,000 are not immediately returned to the firm by 3:00 p.m. today, I must then consider Ms. Mawhinney's actions as the intent to permanently deprive the firm of such funds and will be forced to contact the disciplinary counsel of the Colorado Supreme Court and the local law enforcement agencies of a potential criminal act.

### Claims Five and Six: the Smith and Walker Matters

As a result of Weisbard's preventing Mawhinney's access to the LLC's files, two clients were impacted. In August 1998, Terry Smith ("Smith") faxed a letter to Weisbard requesting that he deliver her file to Mawhinney. In the suit between Weisbard and Mawhinney, Weisbard was ordered to produce the Smith file. Weisbard failed to produce the file. A second client, Maryanne Walker ("Walker"), repeatedly requested that Weisbard provide Mawhinney with her file. Weisbard failed to do so. When Mawhinney requested the files, Weisbard wrote to Mawhinney's attorney saying that he would expect Mawhinney to pay for a staff person to search for them. Rather than pay Weisbard's demand, Mawhinney entered the LLC's storage locker in November 1998 and located and retrieved both the Smith and Walker files. Weisbard's failure to timely provide the files to those clients substantially delayed both cases.

### Claim Seven: the Barton Matter

Kenneth Barton ("Barton") hired Weisbard in December 1997 to represent him in a child support matter. He paid a retainer in the amount of $2,000. Thereafter for a period of six months, Barton, who lives in Oklahoma, tried to contact Weisbard about his case, but Weisbard did not return his calls. During the period of time Weisbard represented Barton, he performed minimal work on the file. When Barton learned about the LLC's breakup, he chose to employ Mawhinney rather than Weisbard. In July 1998, Barton asked Weisbard to return his file and the unearned portion of his retainer which was in the amount of $1,345.98 according to Barton's last billing statement. The Barton file was later partially recreated by Mawhinney and eventually provided by Weisbard. The delay in obtaining the original documents from the Barton file delayed the final resolution of that case. Although Weisbard had not returned Barton's unearned fee as of the date of entry of default, those funds had been refunded by the date of the sanctions hearing.

### Claim Eight: the Trust Account Matters

On or about June 12, 1998, Weisbard wrote a check from the new trust account to his operating account in the amount of $3,500. The check did not indicate that the transfer was for earned fees. On July 31, 1998, Weisbard made a $2,000 deposit into the new trust account so that he could establish a new credit card merchant account.[2] On or about August 3, 1998, Weisbard wrote a check from his trust account to Norwest Bank in the amount of $2,000 to purchase a certificate of deposit to be held by the bank as security for the new credit card merchant account. In September and October 1998, Norwest Bank deducted three payments in the amount of $84.93, $81.27 and $93.61 from Weisbard's trust account for service fees on the credit card merchant account.

### The Requests for Investigation

From December 1998 to February 1999, the Office of Attorney Regulation Counsel

---

**2.** The LLC's credit card merchant account had previously been personally guaranteed by Mawhinney, who withdrew her guarantee upon the breakup of the LLC.

served notice of requests for investigation on Weisbard concerning the complaints filed by Barton, Smith and Walker with that office. Weisbard did not respond.

## III. CONCLUSIONS OF LAW

The People's complaint charged Weisbard with eight separate claims consisting of violations of The Colorado Rules of Professional Conduct ("Colo.RPC"): Colo. RPC 1.15(b) (Travis, Hammons, Remus, Barton, Smith and Walker claims); Colo. RPC 1.4(a) (Travis, Hammons and Remus claims); Colo. RPC 1.3 (Hammons and Barton claims); Colo. RPC 8.4(c) (Hammons, Barton and Trust Account claims); Colo. RPC 4.5(a) (Shefrin claim); Colo. RPC 1.15(a) (Trust Account claim); C.R.C.P. 251.10(a) (Smith, Walker and Barton claims), and C.R.C.P. 251.5(a)(Smith claim).

### A. The Client Matters

■ An attorney has a professional duty, when so requested by a client, to render a full accounting and promptly return unearned funds to which the client is entitled. *See* Colo. RPC 1.15(b).[3] The dispute between Mawhinney and Weisbard did not alter that professional duty. Disputes between lawyers in a law firm or other business combination do not alter the lawyers' professional obligations to their clients under Colo. RPC 1.15(b). Because Weisbard had physical control of the clients' funds, it was incumbent upon him to promptly account for the funds and refund those funds belonging to clients who demanded them. Weisbard's efforts to delay the client refunds until such time as an accounting had been completed was protective of his interests in the financial dispute with his former partner but was in-

consistent with his affirmative obligation to the clients.

In four separate matters, the Barton, Remus, Travis and Hammons claims, Weisbard violated Colo. RPC 1.15(b) by failing to promptly return the balance due on retainers owed to the clients, notwithstanding their request for the funds.

■ Colo. RPC 1.15(b) also requires that, upon request, an attorney will promptly deliver to the client all other property in the possession of the attorney to which the client is entitled. That requirement includes those portions of the client file to which the client is entitled. *See* CBA Ethics Comm. Formal Op. 104 (1999)(discussing the surrender of papers to the client upon termination of representation). In five separate matters (Travis, Hammons, Smith, Walker and Barton) Weisbard violated Colo. RPC 1.15(b) by ignoring clients' requests for their files and failing to promptly assemble and transmit the clients' files. Weisbard's failure to promptly return the client files delayed the ability of at least Barton, Smith and Walker to resolve their cases and thereby caused injury.

■ In two separate matters, the Travis and Barton matters, Weisbard failed to return clients' phone calls for substantial periods of time in violation of Colo. RPC 1.4(a).[4] Further, he violated Colo. RPC 1.3 [5] by failing to file a timely response in the Hammons matter. Although the Complaint charged that Weisbard neglected the Barton matter, no evidence was presented that Weisbard's conduct with regard to Barton would constitute neglect. In the six-month period when Weisbard failed to communicate with Barton,

---

3. Colo. RPC 1.15(b) provides:

   Upon receiving funds or other property in which a client or a third person has an interest, a lawyer shall, promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, render a full accounting regarding such property.

4. Colo. RPC 1.4(a) provides:

   A lawyer shall keep a client reasonably informed about the status of a matter and

promptly comply with reasonable requests for information.

Weisbard was also charged with a violation of Colo. RPC 1.4(a) in the Hammons matter. No evidence was introduced supporting that charge. Accordingly, the alleged violation of Colo. RPC 1.4(a) in the Hammons matter is Dismissed.

5. Colo. RPC 1.3 provides:

   A lawyer shall act with reasonable diligence and promptness in representing a client. A lawyer shall not neglect a legal matter entrusted to that lawyer.

there was no evidence that he was required to take action on behalf of his client and failed to do so. Nor was any evidence presented that the minimal work he did perform on that case during the relevant time frame reflected either a lack of diligence or promptness in the representation. Accordingly, the alleged violation of Colo. RPC 1.3 regarding the Barton claim is dismissed.

### B. Additional Misconduct

■ The Complaint alleged that in the course of discussions regarding the civil matter Weisbard brought against Mawhinney, Weisbard threatened criminal or disciplinary action against Mawhinney unless the money in dispute was returned to him. Weisbard sent correspondence to Mawhinney's attorney in which he stated:

> [I]n the event that the entire fees in the amount of $20,000 are not immediately returned to the firm by 3:00 p.m. today, I must then consider Ms. Mawhinney's actions as the intent to permanently deprive the firm of such funds and will be forced to contact the disciplinary counsel of the Colorado Supreme Court and the local law enforcement agencies of a potential criminal act.

Colo. RPC 4.5(a) provides:

> A lawyer shall not threaten to present criminal, administrative or disciplinary charges to obtain an advantage in a civil matter nor shall a lawyer present or participate in presenting criminal, administrative or disciplinary charges solely to obtain an advantage in a civil matter.

The Comment to the Rule states that:

> Threats [of criminal, administrative or disciplinary charges] are prohibited if a purpose is to obtain *any* advantage in a civil Matter.... [T]he abuse of the judicial process is at its greatest when a threat of filing charges is used as a lever to obtain an advantage in a collateral, civil proceeding (emphasis in original).

The thrust of Weisbard's demand in his letter to Mawhinney's attorney—return the money or criminal and disciplinary complaints will be advanced—necessarily carries with it the implication that if the money is returned, the complaints will not be advanced. Consequently, Weisbard's purpose in making the threat is clear: he sought to obtain an advantage in his civil dispute with Mawhinney and was willing to abuse the judicial process to gain that advantage. Weisbard's threat to advance criminal and/or disciplinary charges against Mawhinney clearly violated Colo. RPC 4.5(a).

■ The Complaint alleged that Weisbard commingled personal funds with client funds in violation of Colo. RPC 1.15(a).[6] At the time of the breakup of the LLC, Weisbard transferred funds from *both* the operating and trust accounts of the LLC to a new trust account in his name. As a result of his fee sharing agreement with Mawhinney, a portion of the funds in the old LLC operating account belonged to him. Consequently, when he combined the old LLC operating account with the old LLC trust account into a single new trust account, client funds were commingled with Weisbard's personal funds and Colo. RPC 1.15(a) was violated. The evidence also established that after the new trust account was created Weisbard deposited $2,000 of his personal funds into the new trust account and thereafter wrote a check on the new trust account to purchase a certificate of deposit as security for a new credit card merchant account. The transfer of the $2,000 in personal funds through the trust account, of necessity, resulted in the commingling of Weisbard's personal funds with client funds and is a separate violation of Colo. RPC 1.15(a).

■ Weisbard transferred $3,500 by check from the new trust account to the operating account, identified the transfer as a "trust transfer" and did not indicate on the check that the withdrawal from the trust account was for earned fees. In addition, Weisbard allowed Norwest Bank to withdraw a total of $259.81 from the trust account to pay fees on the new credit card merchant

---

6. Colo. RPC 1.15(a) provides:
   In connection with a representation, an attorney shall hold property of clients or third persons that is in an attorney's possession separate from the attorney's own property.

account. The Complaint contends that both of these events evidenced the utilization of unearned client funds and constituted dishonesty in violation of Colo. RPC 8.4(c). Neither the allegations advanced in the Complaint nor the evidence presented at trial, however, established by clear and convincing evidence that the $3,500 was not earned at the time of transfer. Merely alleging that the check utilized to transfer the $3,500 did not "indicate" that the funds were earned does not establish that they were not. More is required. Moreover, the allegations of fact set forth in the Complaint and deemed admitted by the entry of default established that Weisbard deposited funds from both the operating and trust accounts of the old LLC into the new trust account. Accordingly, some portion of the funds in the new trust account were funds belonging to Weisbard and not client funds. In order to establish that Weisbard's conduct was dishonest and therefore violated Colo. RPC 8.4(c), the People must prove by clear and convincing evidence that some portion of the $3,500 consisted of client funds. They did not meet that burden.

The evidence was undisputed that Weisbard allowed Norwest Bank to deduct fees for the new credit card merchant account from funds on deposit in the new trust account. It is equally undisputed that the new account contained both client and operating funds from the old LLC accounts. Without evidence that the fees deducted by Norwest Bank were from funds clearly belonging to clients, it cannot be concluded that Weisbard allowed client funds to be improperly utilized to pay his personal expenses or that his conduct was dishonest.[7] Accordingly, the alleged violation of Colo. RPC 8.4(c) in connection with the $3500 check and the merchant account fees is dismissed.

■ The Complaint also charged a violation of Colo. RPC 8.4(c)(dishonesty) in connection with Weisbard's failure to refund $186.50 to Hammons. Weisbard acknowledged, in response to the disciplinary complaint made by Hammons, that he held $186.50 of her funds which were not earned. In connection with Hammons' small claims suit, Weisbard refused to refund the $186.50 to Hammons until she granted him a complete release from claims which she might have against him. At the time of the sanctions hearing, Weisbard had not yet refunded the $186.50. Indeed, by way of mitigation, Weisbard contended at the sanctions hearing that his offer to refund the $186.50 in return for a release was an effort to remedy his misconduct. It is not. The $186.50 was never Weisbard's property with which to bargain. Those funds belonged to Hammons and he had a professional duty to refund them on demand. His attempt to extract a release from Hammons in return for funds he was obligated to promptly convey to her is reprehensible. Weisbard's failure to promptly refund the $186.50 to Hammons is a violation of Colo. RPC 8.4(c)(dishonesty).

The evidence presented at the sanctions hearing established that Weisbard knowingly placed his personal interests before those of his clients. Following the eruption of the dispute with Mawhinney, Weisbard used the clients to further his bargaining position with her. Although disagreements between lawyers in business combinations frequently occur, those disagreements may not be allowed to adversely affect the representation of clients.

Finally, Weisbard violated C.R.P.C. 251.10(a)[8] by failing to respond to the Office of Attorney Regulation Counsel's investigation regarding the Smith, Walker and Barton matters.

## IV. SANCTIONS/IMPOSITION OF DISCIPLINE

■ Following the finding of misconduct, Beverly Hammons and Lee Remus, two of

7. Allowing credit card fees to be deducted directly from an attorney trust account is an extremely poor practice and is highly suspicious of misuse. In light of the other evidence in this case, namely, that the new trust account contained both funds belonging to Weisbard and client funds, the PDJ and Hearing Board cannot conclude by clear and convincing evidence that the $259.81 deducted by Norwest Bank consisted of client funds and not funds belonging to Weisbard.

8. C.R.C.P. 251.10(a) requires that an attorney respond to a written notice that he or she is under investigation within twenty days after notice of the investigation is given.

the complaining witnesses in this case, presented comments to the PDJ and Hearing Board regarding the form of discipline pursuant to C.R.C.P. 251.18(a).

The ABA *Standards for Imposing Lawyer Sanctions* (1991 & Supp.1992) ("ABA *Standards* ") is the guiding authority for selecting the appropriate sanction to impose for lawyer misconduct.

ABA *Standard* 4.12 provides:

Suspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client.

ABA *Standard* 4.42 provides that suspension is generally appropriate when:

(a) a lawyer knowingly fails to perform services for a client and causes injury or potential injury to a client.

Both of the ABA *Standards* apply to Weisbard's misconduct. Weisbard knew or should have known that he had a duty to return the funds and client files to the clients immediately when they were requested. His failure to do so, in at least two instances, caused significant delay to the clients' resolution of their legal matters and thereby caused injury. Retaining client funds over a substantial period of time while informing the clients that the funds would be returned shortly with an accounting, and then failing to take steps to conclude the accounting in a prompt fashion resulted in injury to at least two of Weisbard's clients. This conduct, taken together with Weisbard's failure to return phone calls, neglect of the Hammons matter and commingling client funds with personal funds warrants a period of suspension. Weisbard's threat of criminal charges or disciplinary action against Mawhinney in the course of a civil action in order to obtain an advantage also warrants a period of suspension.

The PDJ and Hearing Board considered factors in aggravation pursuant to ABA *Standards* 9.21. Weisbard had a dishonest or selfish motive, *id.* at 9.22(b); he demonstrated a pattern of misconduct, *id.* at 9.22(c); Weisbard's conduct constituted multiple offenses, *id.* at 9.22(d); and by failing to respond to the requests for investigation in the Smith, Walker and Barton matters, Weisbard demonstrated bad faith obstruction of the disciplinary proceeding, *id.* at 9.22(e). Further, Weisbard had substantial experience in the practice of law, *id.* at 9.22(i), and demonstrated an indifference to making restitution to Hammons, *id.* at 9.22(j). Weisbard's conduct regarding Mrs. Hammons was particularly egregious.[9]

At the sanctions hearing, Weisbard's testimony was considered by the PDJ and Hearing Board solely in mitigation pursuant to ABA *Standards* 9.32. Weisbard did not have a prior disciplinary record, *id.* at 9.32(a). Weisbard argued that his personal and emotional problems significantly impacted his ability to respond to his client needs and prevented him from responding to the Office of Attorney Regulation Counsel's requests for investigation. Weisbard acknowledged, however, that he made a conscious choice not to respond to the disciplinary complaints. Personal or emotional problems may be a mitigating factor pursuant to ABA *Standards* 9.32(c). Since the evidence is clear that Weisbard's personal and emotional problems did not prevent him from continuing to practice law during the pendency of the disciplinary proceedings, the degree of mitigation arising from those personal and emotional problems is minimal.

Weisbard, although verbally expressing remorse, continued during the course of the sanctions hearing to lay blame for his misconduct upon others instead of accepting responsibility for his actions. He argued that no client was harmed by his actions, that the funds he withheld were in small amounts, and that all clients, with the exception of Hammons, had ultimately received their funds. He continued to argue that he was unaware he had possession of the client files, and for this reason did not return them to

---

9. The Complaint in this matter did not allege that Weisbard's misuse of the $186.50 was conversion. Consequently, whether Weisbard's conduct constituted conversion calling for disbar-

ment is not an issue to be determined in this proceeding. *People v. Varallo*, 913 P.2d 1, 11 (Colo.1996).

the clients. Once Weisbard had assumed control of the LLC, it was incumbent upon him to inventory the files. He did not. Weisbard's argument that he was not aware that the files were in his possession in light of his failure to determine whether he had possession of them does not provide mitigation for his misconduct.

The clients were put at substantial disadvantage and exposed to potential injury as a result of the dispute between Weisbard and Mawhinney and Weisbard's response to it. Weisbard's attempted deflection of responsibility for his misconduct arising from that dispute to his former partner does not suggest any genuine measure of remorse on his part justifying reduction of the sanction. *See* ABA *Standards* 9.32(*l* ).

The PDJ and Hearing Board find that Weisbard's misconduct warrants a period of suspension. Weisbard's commingling of funds, failing to return phone calls over an extended period of time to several clients, failing to return the clients' files when requested, and failing to promptly return the clients' balance of their retainers warrants a substantial period of suspension. *People v. Paulson*, 930 P.2d 582, 583 (Colo.1997)(suspending attorney for one year and one day for, among other things, neglecting a legal matter in violation of Colo. RPC 1.3, failing to communicate with clients in violation of Colo. RPC 1.4(a), and failing to promptly deliver to the clients funds or other property the client is entitled to receive in violation of Colo. RPC 1.15(b)); *People v. Fager*, 925 P.2d 280, 282 (Colo.1996)(attorney suspended for one year and one day for neglecting a legal matter in violation of Colo. RPC 1.3, failing to keep funds in a separate account and to maintain complete records of the funds in violation of Colo. RPC 1.15(a), failing to promptly return client property and funds upon request in violation of Colo. RPC 1.15(b) and engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation in violation of Colo. RPC 8.4(c)). An attorney's threatening prosecution or a disciplinary action to gain an advantage in a civil proceeding also warrants a period of suspension. *People v. Farrant*, 852 P.2d 452, 454 (Colo.1993)(attorney suspended for sixty days where he threatened criminal prosecution of principal of corporate client in order to induce principal to withdraw objection to application for attorney fees and to immediately pay fees solely to obtain advantage in civil matter).

The aggravating factors present in this case substantially outweigh the mitigating factors. Weisbard's lack of genuine remorse indicates a failure to recognize the seriousness of his misconduct and is a significant consideration in arriving at the appropriate discipline.

### IV. ORDER

It is therefore ORDERED:

1. Robert J. Weisbard, registration number 18038, is suspended from the practice of law for a period of eighteen months effective thirty-one days from the date of this Order;

2. Weisbard is ORDERED to pay the costs of these proceedings; the People shall submit a Statement of Costs within ten (10) days of the date of this Order. Respondent shall have five (5) days thereafter to submit a response thereto.

3. The alleged violations of Colo. RPC 1.4(a) in the Hammons claim (claim two); Colo. RPC 1.3 in the Barton claim (claim seven), Colo. RPC 8.4(c) in the Trust Account claim (claim eight), are dismissed.